IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **GEORGE C., o/b/o J.C.,** | ) | |
| **A MINOR CHILD,** | ) | |
| Plaintiff | ) | **Civil Action No. 7:19-CV-77** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | **By:  Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| Defendant | ) | |

## MEMORANDUM OPINION

This social security disability appeal was filed by Plaintiff George C. (George) on behalf of his minor grandson, J.C.[1] The appeal was referred to the Honorable Robert S. Ballou, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings of fact and a recommended disposition. The magistrate judge filed a report and recommendation (R&R) on July 28, 2020, recommending that plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and the Commissioner's final decision be affirmed. ECF No. 26. George has filed objections to the R&R and this matter is now ripe for the court's consideration. As discussed more fully below, the court **ADOPTS** in part and **REJECTS** in part the R&R and **REMANDS** J.C.'s case to the Commissioner for further consideration.

---

[1] The appeal originally was filed by J.C.'s mother. However, in March 2016, George obtained custody of J.C. and became the plaintiff in this action.

## I. Background

J.C. is a minor, born on March 20, 2005. R. 435. On October 1, 2010, J.C.'s mother filed an application for supplemental security income (SSI) on his behalf and the claim was approved on February 25, 2011. R. 435-443; 500; 273-286. The basis of his SSI application was a severe articulation impairment. R. 911. The disability examiners determined that he had an extreme limitation in his ability to interact and relate with others because of his speech impairment. R. 913.

On December 2, 2014, the Social Security Administration (SSA) issued a notice that J.C.'s SSI benefits had ceased effective November 1, 2014. The notice stated that J.C. suffered from Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD) and had a secondary diagnosis of asthma. R. 260-263. J.C.'s mother appealed the cessation of benefits and a hearing in front of a disability hearing officer was scheduled for November 30, 2015, but J.C. and his mother did not appear at the hearing. R. 293-94.

The hearing officer reviewed the evidence in the record and determined that there had been a significant decrease in the severity of his speech disorder since the date of the comparison point decision (CPD)[2] of February 17, 2011, and J.C. was no longer disabled by his speech impairment. R. 311-318. A request for a hearing in front of an administrative law judge (ALJ) was made on behalf of J.C. and a hearing was scheduled for June 23, 2016. However, J.C. and his mother did not appear at the hearing and the ALJ dismissed the request for hearing. R. 323-329. On November 16, 2016, the Appeals Council vacated the dismissal,

---

[2]The CPD is the most recent favorable decision involving a consideration of the medical evidence and whether a claimant was disabled or continued to be disabled. 20 C.F.R. § 416.994a(c)(1).

noting that J.C.'s grandfather was awarded custody of J.C. on March 24, 2016 and had notified the SSA of that fact and also of J.C.'s new address. Because the notice of hearing had been sent to J.C.'s prior address, the Appeals Council remanded J.C.'s case for another hearing in front of an ALJ.

An ALJ hearing was held on October 17, 2017 and J.C. and George attended and testified. The ALJ issued an unfavorable opinion on December 13, 2017. R. 195-218. The Appeals Council upheld the unfavorable determination on December 7, 2018.[3] This lawsuit followed.

In the R&R, the magistrate judge concluded that substantial evidence supported the determination that J.C. was no longer disabled after November 1, 2014. In addition, the magistrate judge concluded that new evidence submitted by George on behalf of J.C. did not warrant remand. George objects to the findings of the magistrate judge and his objections are addressed below.

The court also addresses sua sponte the issue of the weight the ALJ gave to the opinion of a speech pathologist who performed a consultative examination of J.C. and to that of two psychologists who performed a consultative examination. See Ricks v. Comm'r of Soc. Sec., No. 2:09cv622, 2010 WL 6621693 at *7 and n. 7 (E.D. Va. 2010) (citing Womack v. Astrue, No. CIV-07-167-W, 2008 WL 2486524, at *5 (W.D. Okla. 2008)) (noting that while district courts decide appeals under the Social Security Act by considering the issues raised and argued

---

[3] The Appeals Council noted that the ALJ made a credibility determination of J.C. and his grandfather and that current SSA regulations no longer provide for ALJ's to make credibility determinations. Rather, adjudicators are to evaluate the intensity, persistence and limiting effects of a claimant's symptoms to determine the extent to which they affect a claimant's ability to function in an age appropriate manner. SSR 16-3p, 2017 WL 5180304 (SSA 2017). Nevertheless, the Appeals Council upheld the unfavorable decision. R. 4-8.

in a plaintiff's brief, a court has a duty to scrutinize the record as a whole to determine whether the conclusions are reasonable and whether the adjudicator applied the correct legal standards to the evidence, especially in the context of a non-adversarial social security disability case); and <u>Scott v. Barnhart</u>, 332 F.Supp.2d 869, 876 (D. Md. 2004) (raising an issue sua sponte in social security appeal and noting "[a] reviewing court cannot properly discharge its judicial review function without an evaluation and explanation of all material evidence.")

## II. Standard of Review of Magistrate Judge Decision

The objection requirement set forth in Rule 72(b) of the Federal Rules of Civil Procedure[4] is designed to "train[ ] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." <u>United States v. Midgette</u>, 478 F.3d 616, 621 (4th Cir. 2007) (citing <u>Thomas v. Arn</u>, 474 U.S. 140, 147–48 (1985)). An objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." <u>Id.</u> at 622.

> To conclude otherwise would defeat the purpose of requiring objections. We would be permitting a party to appeal any issue that was before the magistrate judge, regardless of the nature and scope of objections made to the magistrate judge's report. Either the district court would then have to review every issue in the magistrate judge's proposed findings and recommendations or courts of appeals would be required to review issues that the district court never considered. In either case, judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined.

<u>Id.</u>

---

[4] "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b).

The district court must determine <u>de novo</u> any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" <u>de novo</u> review is not required. <u>Diprospero v. Colvin</u>, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. 2014) (quoting <u>Howard Yellow Cabs, Inc. v. United States</u>, 987 F. Supp. 469, 474 (W.D.N.C. 1997) and <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982)). "The court will not consider those objections by the plaintiff that are merely conclusory or attempt to object to the entirety of the Report, without focusing the court's attention on specific errors therein." <u>Camper v. Comm'r of Soc. Sec.</u>, No. 4:08cv69, 2009 WL 9044111, at *2 (E.D. Va. 2009), <u>aff'd</u>, 373 F. App'x 346 (4th Cir.); <u>see</u> <u>Midgette</u>, 478 F.3d at 621 ("Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only '<u>those portions</u> of the report or <u>specified</u> proposed findings or recommendations <u>to which objection is made</u>.'") (emphasis in original). Such general objections "have the same effect as a failure to object, or as a waiver of such objection." <u>Moon v. BWX Technologies</u>, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), <u>aff'd</u>, 498 F. App'x 268 (4th Cir. 2012). <u>See also</u> <u>Arn</u>, 474 U.S. at 154

("[T]he statute does not require the judge to review an issue de novo if no objections are filed. . . .").

Rehashing arguments raised before the magistrate judge does not comply with the requirement set forth in the Federal Rules of Civil Procedure to file specific objections. Indeed, objections that simply reiterate arguments raised before the magistrate judge are considered to be general objections to the entirety of the report and recommendation. See Veney v. Astrue, 539 F. Supp. 2d 841, 844-45 (W.D. Va. 2008). As the court noted in Veney:

> Allowing a litigant to obtain de novo review of her entire case by merely reformatting an earlier brief as an objection "mak[es] the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act." Howard [v. Sec'y of Health & Human Servs.], 932 F.2d [505,] [] 509 [(6th Cir. 1991)].

Veney, 539 F. Supp. 2d at 846. A plaintiff who reiterates her previously-raised arguments will not be given "the second bite at the apple she seeks;" instead, her re-filed brief will be treated as a general objection, which has the same effect as would a failure to object. Id.

## III. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In so doing, the court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Evidence is substantial when, considering the

record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401; Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

## IV.  The ALJ Determination

### A. Initial Determination

When assessing a child's application for disability, the SSA engages in a three-step sequential evaluation, set out at 20 C.F.R. § 416.924. First, the adjudicator determines if the child is engaged in substantial gainful activity. If so, the child is not disabled. If the child is not engaged in substantial gainful activity, the adjudicator next determines whether the child has an impairment or combination of impairments that is severe. If the impairment is not severe, the child is not disabled. If the child has a severe impairment, the ALJ moves on to the third step of the evaluation and reviews the claim to determine whether the child has an impairment that meets, medically equals, or functionally equals a listed impairment. If the child has such an impairment, and it meets the duration requirement, the adjudicator will find the child disabled. Id.

To find that an impairment functionally equals a listing, the adjudicator must find that the impairment results in "marked" limitation in two domains of functioning or "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The adjudicator assesses what the claimant cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairments, assessing the interactive and cumulative effects of all the impairments, including those which are not severe. Id. The domains are broad areas of functioning intended to capture all of what a child can or cannot do and include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A "marked" limitation in a domain means that a claimant's impairment interferes seriously with his ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. A "marked" limitation also means a limitation that "is more than moderate" but "less than extreme" and is the equivalent of functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

An "extreme" limitation in a domain means an impairment interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be very seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. An "extreme"

limitation also means one that is "more than marked." An "extreme" limitation does not necessarily mean a total lack or loss of ability to function and is the equivalent of functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

## B. Evaluation of Continuing Disability

In evaluating continuing disability for a child, the adjudicator looks at several factors. The first factor considered is "medical improvement," which is any decrease in the medical severity of the impairment which was present at the time of the most recent favorable decision, or CPD, that the child was disabled. 20 C.F.R. § 416.994a(c). If there has been medical improvement, the adjudicator determines whether the improvement falls within a list of exceptions to medical improvement, none of which are relevant here. 20 C.F.R. § 416.994a(c), (e), and (f). If the medical improvement does not fall into one of the exceptions, the adjudicator determines whether the impairment still meets or equals the severity of the listed impairment that it met or equaled before. 20 C.F.R. § 416.994a(b)(2). If the impairment still meets or equals the severity of the listed impairment, the claimant is still disabled. Id. If the impairment does not still meet or equal the severity of the listed impairment, the adjudicator determines whether the claimant is disabled under the rules set out in 20 C.F.R. § 416.924. In determining whether a claimant is currently disabled, the adjudicator considers all the impairments the claimant has, including any he did not have at the time of the CPD, or that were not considered at that time. 20 C.F.R. § 416.994a(b)(3).

In J.C.'s case, the ALJ found that the CPD was the determination made on December 18, 2011 that J.C. was disabled. R. 201. At the time of the CPD, J.C. had a speech articulation

disorder that functionally equaled the listings because it resulted in an extreme limitation in the domain of interacting and relating with others. R. 202. The ALJ next found that as of November 1, 2014, the speech articulation disorder has not functionally equaled the listing of impairments because he now has only minor speech problems, specifically in articulation. R. 202.

The ALJ next found that since November 1, 2014, J.C. has had the following severe impairments: a learning/reading disorder, a speech impairment, asthma, attention deficit/hyperactivity disorder, and an anxiety disorder. R. 208. She found that none of the impairments or combination of impairments met or equaled a listed impairment and that the impairments did not functionally equal the listings. R. 208-209.

In assessing the domains, the ALJ found that J.C. had (1) no limitation in acquiring and using information as a result of the impairments present at the CPD, although he did have limitations secondary to his other impairments; (2) no limitation in attending and completing tasks as a result of the impairments present at the CPD, although he did have limitations secondary to his other impairments; (3) less than a marked limitation in interacting and relating with others as a result of the impairments present at the CPD "with any limitations related to his speech impairment discussed below in conjunction with his other impairments;" (4) no limitation in moving about and manipulating objects as a result of the impairments present at the CPD; (5) no limitation in his ability to care for himself; and (6) no limitation in his health and physical well-being. R. 202-208. Thus, she found him not disabled as of November 1, 2014.

George argued to the magistrate judge that the ALJ erred when she determined that J.C. had less than a marked limitation in the domain of acquiring and using information and less than a marked limitation in the domain of attending and completing tasks. George further argued that the ALJ improperly assessed the subjective allegations of limitations that he and J.C. testified about at the hearing. Finally, George argued that remand is warranted in J.C.'s case based on new evidence submitted to the Appeals Council.

The magistrate judge concluded that the ALJ properly assessed J.C's functioning in the six domains and also properly concluded that the subjective allegations of disability were not entirely consistent with the record. In addition, the magistrate judge determined that new evidence submitted to the Appeals Council did not warrant remand.

## C. Objections

### (1) Acquiring and Using Information

George objects to the magistrate judge's conclusion that substantial evidence supports the determination that J.C. had a less than marked limitation in acquiring and using information. George points to an assessment done by Lisa Riddle, one of J.C.'s teachers, on August 15, 2017, when J.C. was twelve years old. Ms. Riddle noted that J.C. was significantly below grade level in reading and he received special education services daily. R. 687. In assessing J.C. for the domain of acquiring and using information, she described him as having no problem in comprehending oral instructions, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. She further found he had a slight problem providing organized oral explanations and adequate descriptions; a serious problem in

understanding school and content vocabulary; and a very serious problem in reading and comprehending written material and learning new material. R. 688.

The ALJ considered Ms. Riddle's assessment, but also noted that J.C.'s math teacher and case worker assessed him as having no limitations in the domain of acquiring and using information. R. 217, 696. The ALJ acknowledged that J.C. has an individual education program (IEP) and receives accommodations. R. 217, 555-566, 602-616, 631-641, 662-686, 705-716. Educational testing showed J.C. to be in the low average range of intelligence although he had weaknesses in word reading skills and comprehension. R. 217, 957-962. Nevertheless, as the ALJ noted, J.C. has not been retained. Additionally, the ALJ also gave some weight to the opinions of the initial state consultants who were unable to discuss J.C.'s speech impairment, and she gave significant weight to the to the state consultants on reconsideration who found that J.C. did not have a marked limitation in any domain. R. 216, 970-975, 1016-1021.

George points out that the state agency consultants did not have the benefit of Ms. Riddle's evaluation, which is true. However it is also true that they did not have the benefit of the report from J.C.'s math teacher and case worker who found he had no limitations in the domain of acquiring and using information, so it is unclear whether having the reports would have change their analyses.

Nevertheless, the court finds that the ALJ did not sufficiently explain her determination that J.C. has a less than marked limitation in acquiring and using information. J.C. underwent a consultative examination by Kathy Jo Miller, M.Ed., and Robert S. Spangler, Ed.D., on September 22, 2014. R. 957-961.  J.C. was nine years old and in fourth grade at the time of the examination and test results showed that his word reading was at the kindergarten level with

12

a percentile of 0.3 and his reading comprehension was less than kindergarten level, with a percentile of 0.5. His arithmetic computation was at the third-grade level with a percentile of 32. The examiners commented that he was in the low average range of intelligence. R. 960. The ALJ noted the assessment of "low average range of intelligence" and gave the opinion "some weight," but did not discuss the relevance of the objective tests showing his very limited reading skills in the context of his ability to acquire and use information. R. 216.

The ALJ must include a narrative discussion describing how the evidence in the record supports each conclusion, including her determinations regarding the weight she gives to different opinions. Monroe v. Colvin, 826 F.3d 176, 190 (4th Cir. 2016). The court finds that the ALJ did not provide an adequate explanation for why she gave only "some weight" to the opinion of the consultative examiners who found that J.C. was reading at kindergarten and pre-kindergarten levels when he was in the fourth grade. In addition, evidence in the record shows that as of April 2017, J.C. continued to receive special education services and accommodations and was still performing below grade level, particularly in reading. R. 670. He also continued to qualify for a "read-aloud" accommodation. R. 669.

It is true that other evidence in the record shows that J.C. has strong math skills and has been described as a leader with other students who struggle in math. R. 669. In addition, it was noted that he has strong language skills and has corrected many of his sound errors to the sentence level and had age appropriate social language skills. Id. However, a claimant has a "marked" limitation in a domain when an impairment interferes seriously with his ability to independently initiate, sustain, or complete activities, and day-to-day functioning may be seriously limited when impairments limit only one activity. 20 C.F.R. § 416.926a(e)(2)(i).

Despite J.C.'s strong math skills, evidence in the record indicates that he has difficulties functioning independently when it comes to reading.

The court finds that the ALJ did not adequately explain her reason for giving the opinion of the consultative examiners only "some weight." Accordingly, George's objection to the magistrate judge's finding on this issue is **SUSTAINED**.

### (2) Attending and Completing Tasks

George objects to the magistrate judge's conclusion that substantial evidence supports the determination that J.C. had a less than marked limitation in the domain of attending and completing tasks. He argues that although J.C. may not have been exhibiting as much hyperactive behavior, his ability to concentrate, focus, and complete tasks was still severely compromised, resulting in academic struggles. George again points to Ms. Riddle's assessment that J.C. performs significantly below grade level, and also points to records of his visits with Robin L. Wiley, L.P.C., and one record of a visit to psychiatrist Katherine Liebesny, M.D., presumably to show that J.C. continues to suffer from ADHD.

However, even Ms. Riddle, who evaluated J.C. as being significantly below grade level, found that he had only a slight problem refocusing on a task when necessary, carrying out multi-step instructions, and working at a reasonable pace and finishing on time; and an obvious problem working without distracting himself or others. She found he had no problem in all the other activities listed under the domain of "attending and completing tasks:" paying attention when spoken to directly, sustaining attention during play and sports activities, focusing long enough to finish an assigned activity or task, carrying out single step instructions, waiting to take turns, changing from one activity to another without being disruptive, and

organizing his things and school materials. R. 689. His math teacher and case manager found

he had a slight problem with carrying out multistep instructions and no problem with the other

activities. R. 697.

Also, although J.C. has been diagnosed with ADHD, his medication regimen appears

to have reduced his symptoms. In April 2017, his IEP summary noted that he always did his

homework and turned in all his work without needing teacher or staff assistance. His

behavioral skills were within the same limits as his peers. R. 670. When J.C. obtained refills for

the Focalin which was prescribed for the ADHD in late 2014, he and his mother both stated

that the medications worked well with no side effects. R. 981, 986. In the September 22, 2014

consultative examination it was reported that his ability to sustain concentration and

persistence were not significantly limited during the evaluation and his ADHD was described

as being in "good pharmacological control." R. 960. In August and September 2017, the

psychiatrist described J.C.'s ADHD as "mostly well controlled" and added that he needed a

small dose of medication in the afternoon. R. 1284, 1354.

Based on the foregoing, the court finds that the magistrate judge correctly determined

that substantial evidence supports the ALJ's conclusion that J.C. had a less than marked

limitation in the domain of attending and completing tasks. George's objection to this finding

is **OVERRULED**.[5]

---

[5] George also argued that "the Report and Recommendation also ignores the fact that the ALJ erroneously compared J.C. to his peers in his special education classes instead of comparing his performance to peers his age who do not receive accommodations." ECF No. 27 at 4. George does not elaborate on this argument and the court does not address it because it is conclusory and unsupported by evidence or argument.

### (3) Consistency of Subjective Allegations with the Record

On October 25, 2017, the SSA issued SSR 16-3p, 2017 WL 5180304 (SSA 2017) which supersedes SSR 96-7P, 1996 WL 374186 (SSA 1996). In issuing the new ruling, the SSA eliminated the use of the term "credibility" from its sub-regulatory policy and clarified that subjective symptom evaluation is not an examination of an individual's character. Adjudicators no longer assess subjective complaints in terms of credibility. Rather the adjudicator first determines whether an individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. If the claimant has a medically determinable impairment, the adjudicator evaluates the intensity and persistence of symptoms and the extent to which the symptoms limit the claimant's ability to perform work-related activities, or, in the case of a child, function independently, appropriately, and effectively in an age-appropriate manner. SSR 16-3P, 2017 WL 5180304, at *4.

The adjudicator considers whether a person's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings in the record. Id. at *5. The adjudicator also considers evidence from other sources, and if the claimant is a child, considers evidence submitted from educational agencies and personnel, statements from parents and other relatives, and evidence submitted by social welfare agencies, therapists, and other practitioners. Id. at *6. The adjudicator is directed to explain which of an individual's symptoms were found consistent or inconsistent with the evidence in the record and how the evaluation of the symptoms led to the conclusions. Id. at *8.

In J.C.'s case, the Appeals Council adopted the ALJ's finding that J.C. was not disabled, but noted that that ALJ should have utilized SSR 16-3p rather than SSR 96-P in assessing George and J.C.'s statements about the limiting effects of J.C.'s impairments. R. 5. The Appeals Council summarized the testimony of J.C. and George as follows:

> At the hearing, claimant testified that he currently is in 7th grade, that his grades are okay and his favorite subject is math. He stated that he likes to workout with weights, plays football, wrestles, and participates in the shot put. He testified that he has no problems getting along with his grandparents, teachers, and friends. In regard to his impairments, claimant testified that he gets anxiety at school when he does not understand something. He states that this anxiety continues when he plays football since he gets nervous [sic] he will not remember what to do. He states these anxiety issues have persisted since the 3rd grade. He also testified that he participates in speech therapy.
>
> Claimant's grandfather and guardian, George [ ], also testified at the hearing. He stated that he has legal custody of the claimant and that he resides with claimant. He testified that claimant experiences frustration where he will get mad, hit things, and cry. He further indicates that claimant has problems at school with his behavior related to his anxiety. Regarding his speech impairment he stated that claimant speaks in a low tone, he speaks real fast when nervous and it is hard to understand what he's saying during these times of nervousness. He stated claimant participates in speech therapy. He testified the claimant has Attention Deficit Disorder and takes medications. He stated claimant participates in counseling.

R. 5-6. The Appeals Council found that the evidence did not support J.C.'s alleged loss of functioning, pointing out that although J.C. continues to receive speech therapy, the treating speech-language pathologist assessed his speech at 80 percent intelligibility to familiar listeners and 70 percent to unfamiliar listeners. R. 6, 1014-1015. The Appeals Council also noted that on September 12, 2017, the treating psychiatrist described J.C. as calm and cooperative, his affect was anxious but with some improved range, he had adequate attention and improving insight and judgment. R. 6, 1354. The Appeals Council also pointed to the findings by the state agency consultants who found that medical improvement had occurred and that J.C. had less

than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. R. 6, 972, 1018. The Appeals Council concluded that the subjective statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence in the record.

The magistrate judge found that substantial evidence supported the Appeals Council's conclusion that statements made by J.C. and George were not entirely consistent with the record. George objects that although the magistrate judge pointed to the Appeals Council's assessment of J.C's anxiety and speech impairments, he did not "address the allegations regarding J.C.'s academic struggles, difficulty reading, and difficulty focusing and completing tasks." ECF No. 27 at 4-5.

This objection is overly broad and does not direct the court to the evidence in the record that supports the subjective allegations to which George and J.C. testified at the ALJ hearing. See Midgette, 478 F.3d at 621-22 (finding that a party must object "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.") If George believes that the magistrate judge failed to address an instance where the Appeals Council did not explain why it found a subjective allegation of impairment inconsistent with evidence in the record, he must describe the instance with enough detail to allow for review. Because he did not do so, George's third objection is **OVERRULED**.

**(4) Consideration of New Evidence**

In Wilkins v. Sec'y Dep't Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991), the Fourth Circuit held that "The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review 'if the additional evidence is (a) new,

(b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" (quoting
Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)). In addition, there must also be a
reasonable probability that the additional evidence would change the outcome of the decision.
20 C.F.R. § 404.970. "Evidence is new 'if it is not duplicative or cumulative' and is material if
there is 'a reasonable possibility that the new evidence would have changed the outcome.'"
Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011) (citing Wilkins, 953 F.2d at 96).

After the ALJ hearing, George submitted additional evidence to the Appeals Council,
which found that the evidence did not show a reasonable probability that it would change the
outcome of the decision. The evidence consisted of records from Robin Wiley, a licensed
professional counselor who has seen J.C. regularly for several years, R. 11-97; records from
Roanoke Memorial Hospital, R. 98-131; records from Carilion Clinic, R. 132-149; and records
of J.C.'s psychiatric treatment by Dr. Liebesny, R. 150-181.

The ALJ issued her opinion on December 13, 2017. The magistrate judge found that
much of the evidence did not relate back to the relevant time period and that when the
evidence did relate back, it was cumulative of evidence already in the record.

George objects that the magistrate judge ignored the fact that the Appeals Council
discounted the additional evidence which documented that he had repeated periods of
dissociation and was seen in the hospital emergency room following an episode in September
2018. Dr. Liebesny commented on June 19, 2018 that J.C. was experiencing a significant
increase in Post-Traumatic-Stress Disorder symptoms and that his caregivers would create an
aggressive stabilizing plan and use the hospital if needed. R. 170.

19

George is correct that the additional evidence showed that J.C. began to have dissociative experiences in June 2018. He underwent surgery for a Chiari malformation at the end of May 2018 and when he saw Dr. Liebesny on June 14, 2018, George and J.C. reported that since the surgery, J.C. had an increase in the frequency and intensity of his flashbacks both at night and during the day and there was "strong evidence for dissociation." He was waking up drenched in sweat and his grandparents reported that he was talking about a "bad man in a tent" and that he was going to be killed. R. 164-165.

On August 9, 2018 and September 13, 2018 J.C. reported that the dissociative episodes continued but were less severe. R. 174, 178. However, he had a dissociative episode on September 21, 2018 while at a therapy appointment. The therapist was explaining to J.C. that he was not alone in the abuse he had suffered and she showed him some statistics about child abuse. He began to stare into space, clutch his hands, and shake periodically. He would not respond to the therapist, his grandmother, or grandfather and stopped breathing. His grandmother performed CPR and J.C. was transported to the hospital. When he was conscious, he was yelling, "stop hitting me, I can't take it anymore, my head hurts" and ducking and flinching as if he were trying to evade a blow. R. 94. At the hospital he was described as being "in acute distress, thrashing around in bed, trying to hold breath." R. 141. Although Dr. Liebesny supported his admission to the hospital, his grandparents preferred that he be discharged to them and he was. R. 146-147. There are no further records describing to J.C.'s status after he was discharged from the hospital.

The evidence of J.C.'s dissociative episodes is new and material, but it does not relate to the period before the ALJ issued her decision in December 2017 as the first mention of a

dissociative episode is in June 2018. George argues that the dissociative episodes are evidence of the harmful effects of the abuse and neglect J.C. experienced prior to going to live with his grandparents and that it shows that his impairments were more severe than the ALJ appreciated at the time she issued her determination. However, this argument ignores that the crux of an adjudicator's evaluation of disability is determining how the claimant functions in the six domains and the additional evidence does not change that assessment for the time period before the ALJ issued her opinion. Based on the foregoing, the court finds that the Appeals Council correctly determined that there was not a reasonable probability that the additional evidence would have changed the outcome of the ALJ's decision. Accordingly, George's objection to the magistrate judge's finding that the Appeals Council correctly excluded the evidence is **OVERRULED**.

### D. Weight Given to Opinions of Consultative Examiners

As discussed above, although George did not raise the issue of the weight the ALJ gave the opinions of two consultative examiners in the record, the court has a duty to scrutinize the record to determine whether the conclusions are reasonable and whether the adjudicator applied the correct legal standards to the evidence, especially in the context of a non-adversarial social security disability case. Ricks, 2010 WL 6621693 at *7 and n. 7; Scott, 332 F.Supp.2d at 876. Upon review of the record, the court finds that the decisions to give the opinions "some weight" and "less weight" are not supported by substantial evidence.

On December 18, 2011, when the CPD was issued, J.C. was found to have an extreme limitation in interacting and relating with others, based on his speech articulation disorder. R. 201-02. On September 14, 2011, J.C.'s speech and language were evaluated by a speech

pathologist at his elementary school. As part of the assessment, the speech pathologist administered the Goldman-Fristoe Test of Articulation, 2nd Edition (GFTA-2). R. 553-54. In the test results, it was noted that a student who receives a standard score between 85 and 115 was considered to have scored within normal limits. J.C. received a standard score of 44, which was in the lowest one percentile of children tested. Although he was five years and eight months old at the time of the test, his test age equivalency was two years and six months. R. 554. These results were consistent with earlier scores on GFTA-2 tests. On January 20, 2011, J.C. had a standard score of 41 on the test and on June 15, 2010 he had a standard score of 54. R. 900-01, 916. These test results were considered by the adjudicator in determining that J.C. had an extreme limitation in interacting and relating with others. R. 916.

After it was determined that medical improvement had occurred such that J.C. no longer had an extreme limitation based on his speech articulation disorder, and his mother appealed that decision, the SSA referred J.C. to Jessi Smith, a speech language pathologist, for a consultative evaluation. The evaluation occurred on May 8, 2015 and as part of the evaluation, Ms. Smith administered the GFTA-2 articulation test. R. 997-1013. It was noted again that the standard score has a mean of 100 and a standard deviation of 15 and that scores falling within the range of 85-115 were considered within normal limits for J.C.'s chronological age. R. 998. Test results showed that J.C. had a standard score of 40, once again noted to be in the lowest one percentile of children tested. Also, with a standard deviation of 15, a score of 40 was four standard deviations below the mean. R. 998. In summarizing the results, Ms. Smith stated that J.C.'s articulation skills were within the "severely disordered range as compared to his same aged peers, resulting in reduced speech intelligibility." R. 999. She also

commented that J.C.'s speech was 80 to 85 percent intelligible to her, an unfamiliar but trained listener, but it was expected that same-age peers or unfamiliar listeners would have a much more difficult time understanding him. R. 998.

The ALJ found that Ms. Smith's evaluation was entitled to "less weight," because her description of J.C. as being in the "severely disordered range" was not defined in Agency terms. R. 216. However, this finding is at odds with both the regulations and the record. J.C.'s articulation test score was four standard deviations below the mean and the SSA defines an "extreme" limitation as the equivalent of functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3). In addition, J.C.'s score on the GFTA-2 was lower in 2015 than it was in 2011 when he was found to have a severe articulation disorder. Compare R. 544 with R. 998. The court further notes that the IEP report dated April 10, 2017 indicates that J.C. was administered the third edition of the Goldman-Fristoe Test of Articulation and once again had a standard score of 40 and was in the lowest one percentile of children tested. R. 669. The ALJ did not mention the 2017 test scores.

While the SSA does not rely on test scores alone when determining whether a claimant has a "marked" or "extreme" limitation in a domain, it considers test scores along with other information about functioning, including classroom performance and observations by school personnel and others. 20 C.F.R. § 416.926a(e)(4)(ii). In J.C.'s case, the ALJ did not discuss the test scores at all. The court finds that her failure to do so, along with the fact that the test scores were lower than scores J.C. made during the time he was found disabled, means that

her decision to give Ms. Smith's consultative opinion "less weight" is not supported by substantial evidence.

Also, as discussed above, J.C. underwent a consultative examination by Ms. Miller and Dr. Spangler on September 22, 2014. R. 957-961.  J.C. was nine years old and in fourth grade at the time of the examination. Test results showed that he was in the low average range of intelligence. His word reading was at the kindergarten level with a percentile of 0.3 and his reading comprehension was less than kindergarten level, with a percentile of 0.5. His arithmetic computation was at the third-grade level with a percentile of 32. The examiners found that his abilities to adapt and to understand and remember were moderately to severely limited by his learning disability and reading. R. 961. The ALJ gave this opinion only "some weight" because "moderately to severely" limited was not defined. R. 216. However, she did not discuss the significance of the test results showing that J.C. was reading at or below kindergarten level even though he was in fourth grade.

The court finds that the ALJ did not adequately explain her reasons for giving limited weight to the findings of the consultative examiners and that in both cases, she failed to discuss the significance of objective test results. See Monroe, 826 F.3d at 190. Accordingly, on remand, the Commissioner should further evaluate the opinions of the consultative examiners in accordance with the relevant SSA criteria. If the Commissioner determines that the opinions are entitled to more weight than the ALJ gave them, the Commissioner is further directed to revaluate George's claim that J.C. was entitled to disability benefits after November 1, 2014.

## V. Conclusion

For the reasons stated, the court **ADOPTS** in part and **REJECTS** in part the R&R, ECF No. 26, filed in this case. The court finds that remand is warranted so that the Commissioner can further evaluate the opinions of the consultative examiners in this case. As such, the court **REMANDS** this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this opinion.

An appropriate Order will be entered.

It is so **ORDERED**.

Entered:   September 21, 2020

Michael F. Urbanski
Chief U.S. District Judge
2020.09.21 11:26:20 -04'00'

Michael F. Urbanski
Chief United States District Judge